ORIGINAL

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Harold G. Levison (HL-6794)
One Gateway Center
Suite 2600
Newark, New Jersey 07102
(973)645-9462
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------------x
METROPOLITAN LIFE INSURANCE COMPANY,      :
and METROPOLITAN INSURANCE AND ANNUITY    :
COMPANY,                                  :    Civ. No. 03cv1882
                                          :
                                          :
                             Plaintiffs,  :
                                          :
          v.                              :
                                          :
                                          :
BANK ONE, N.A.,                           :
                                          :
                             Defendant.   :    4-28-03
-----------------------------------------x

PLAINTIFFS METROPOLITAN LIFE INSURANCE COMPANY AND
METROPOLITAN INSURANCE AND ANNUITY COMPANY'S
RULE 7.1 STATEMENT

Pursuant to Rule 7.1 of the Federal Rules of Civil

Procedure and to enable judges and magistrates of the Court to

evaluate possible disqualification or recusal, the undersigned

counsel for plaintiffs Metropolitan Life Insurance Company

("MLIC") and Metropolitan Insurance And Annuity Company ("MIAC")

state that both MLIC and MIAC are wholly-owned subsidiaries of

MetLife, Inc.

Dated:    Newark, New Jersey
          April 25, 2003

                              KASOWITZ, BENSON, TORRES
                              & FRIEDMAN LLP

                       By: 

                              Marc E. Kasowitz
                              Daniel R. Benson
                              Harold G. Levison
                              Cindy Caranella Kelly

                              One Gateway Center
                              Suite 2600
                              Newark, New Jersey  10019
                              (973) 645-9462

                              Attorneys for Plaintiffs



ORIGINAL

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Harold G. Levison (HL-6794)
One Gateway Center
Suite 2600
Newark, New Jersey 07102
(973)645-9462
Attorneys for Plaintiffs

4-28-03

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
----------------------------------------x
METROPOLITAN LIFE INSURANCE COMPANY,        :
and METROPOLITAN INSURANCE AND ANNUITY      :
COMPANY,                                    :     Civ. No. 03cv1882
                                            :
                                            :
                      Plaintiffs,           :     COMPLAINT
                                            :
          v.                                :
                                            :     TRIAL BY JURY
                                            :     DEMANDED
BANK ONE, N.A.,                             :
                                            :
                      Defendant.            :
----------------------------------------x

     Plaintiffs Metropolitan Life Insurance Company ("MLIC"),

with its principal place of business located at 1 Madison

Avenue, New York, New York, 10010 and an office located at 10

Park Avenue, Morristown, New Jersey, and Metropolitan Insurance

and Annuity Company ("MIAC"), with its principal place of

business located at 1 Madison Avenue, New York, New York, 10010

(together, "MetLife"), for their complaint against defendant

Bank One, N.A. ("Bank One"), with its principal place of business

located at 100 East Broad Street, Columbus, Ohio, 43271, allege

as follows:

## Preliminary Statement

1.     This action arises from defendant's breaches of its
contractual and fiduciary duties, gross negligence and
negligence in connection with the perpetration of a massive
fraudulent scheme against holders (the "Noteholders") of Health
Care Receivables Securitization Program Notes (the "Notes")
issued by NPF XII, Inc. ("NPF XII"), a subsidiary of National
Century Financial Enterprises, Inc. ("NCFE").  Plaintiffs
purchased and own Notes in the aggregate principal amount of
approximately $121 million.

2.     NPX XII was a special purpose corporation formed by
NCFE purportedly for the purpose of purchasing high quality
accounts receivable at a discount from health care providers,
funding such purchases through a series of issuances of Notes,
and collecting on such receivables from insurance companies and
government agencies.

3.     The Notes were issued pursuant to a Master Indenture
dated March 10, 1999 (as amended, modified and/or supplemented)
(the "Master Indenture").  The Notes were required to be rated
"AAA" or its equivalent by nationally recognized ratings
agencies.  The structure of the receivables purchases was
supposed to insulate the Noteholders from the credit risks of
the providers.

2

4.     Under the Master Indenture, Bank One agreed to serve as indenture trustee and fiduciary on behalf of the Noteholders.

5.     Pursuant to the Master Indenture the Notes were supposed to be fully collateralized -- indeed, significantly over-collateralized -- by, among other things, the accounts receivable and segregated cash reserve accounts to be held by Bank One for the benefit of the Noteholders.

6.     In fact, however, NCFE's business -- and Bank One's participation in it -- were suffused by gross and systematic irregularities and fraud.  NCFE, acting through NPF XII and another subsidiary, NPF VI, Inc. ("NPF VI") (NCFE, NPF XII, and NPF VI being collectively referred to as the "NCFE entities"), used the proceeds of the Note issuances not to acquire eligible accounts receivable, but to extend unsecured credit to companies associated with NCFE insiders and to misappropriate funds for the benefit of NCFE insiders.  Moreover, in violation of the terms of the Master Indenture, the Notes were never appropriately collateralized, and all but a small portion of the segregated cash reserve accounts has been dissipated.  As a result of this fraudulent scheme, the NCFE entities have filed for bankruptcy protection, and plaintiffs' Notes have substantially decreased in value.

3

7.   Defendant's wrongful conduct made this fraudulent scheme possible.  Bank One knowingly, recklessly, or with gross negligence, itself and in concert with the NCFE entities, participated in and implemented NCFE's fraud, breached its fiduciary duties to the Noteholders -- duties Bank One explicitly agreed to assume -- and repeatedly violated the clear terms of the Master Indenture.  Among other things, Bank One implemented repeated improper transfers of funds from the cash reserve accounts in violation of the Master Indenture and concealed from plaintiffs the massive depletion of assets.  In particular, for example, Bank One repeatedly implemented a system of so-called "roundtripping" -- the improper transferring of funds back and forth between NPF VI reserve accounts and NPF XII reserve accounts, which were supposed to be segregated at all times -- in order to give the false appearance  that the strict reserve requirements under the Master Indenture were being met.

8.   In short, Bank One directly participated in and made possible a continuing course of fraudulent conduct on a massive scale, for which Bank One is liable to plaintiffs for compensatory and punitive damages.

4

### THE PARTIES

9.  Plaintiff MLIC is a New York corporation, with its principal place of business in New York, New York, and an Investments Office in Morristown, New Jersey.  MLIC purchased and holds Notes in the principal amount of approximately $102.6 million.

10.  Plaintiff MIAC, an affiliate of MLIC, is a Delaware corporation, with its principal place of business in New York, New York.  MIAC purchased and holds Notes in the principal amount of approximately $18.46 million.

11.  Defendant Bank One is a national banking association, with its principal place of business in Ohio.

### JURISDICTION AND VENUE

12.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.  Venue is proper in this District pursuant to 28 U.S.C. § 1391, because the defendant resides in this District, and because a substantial part of the events or omissions giving rise to these claims occurred in this District.

FACTS

## A.   The NCFE Entities

13.   NCFE, an Ohio corporation, was, until recently, one of
the country's largest providers of health care accounts
receivable financing, acting principally through wholly owned
subsidiaries, including NPF VI and NPF XII. NCFE was founded in
1991 by Lance K. Poulsen ("Poulsen"), its former chairman and
chief executive officer.  On November 8, 2002, after NCFE's
fraudulent conduct and financial difficulties began to come to
light, Poulsen resigned all of his director and officer
positions with NCFE and its subsidiaries, and NCFE retained a
professional crisis management firm to manage its operations and
winding down efforts.

14.   NPF XII, an Ohio corporation, was formed as a special
purpose corporation by NCFE for the purpose of purchasing health
care accounts receivables and funding such purchases with the
proceeds from a series of issuances of Notes pursuant to the
Master Indenture.  NPF VI was a similar special purpose
corporation also wholly owned by NCFE, which issued notes
pursuant to a different indenture.  The Master Indenture was
entered into by NPF XII, Bank One, as Trustee for the
Noteholders, and National Premier Financial Services, Inc.

6

("NPFS"), also an Ohio corporation wholly owned by NCFE, as Servicer of the accounts receivable.

B.   The Note Offerings

15.   During 1999 to 2002, NPF XII issued Notes in the aggregate principal amount of over $2 billion, in a series of Note offerings, including those described below.  All of the Notes were issued pursuant to the Master Indenture, as supplemented by a separate Supplemental Indenture for each offering.

16.   On or about March 20, 2001, NPF XII issued Notes in the principal amount of $300,000,000, including $288,000,000 in Class A Notes and $12,000,000 in Class B Notes (the "2001-1 Series").

17.   On or about June 21, 2001, NPF XII issued Notes in the principal amount of $250,000,000, including $240,000,000 in Class A Notes and $10,000,000 in Class B Notes (the "2001-2 Series").

18.   On or about November 8, 2001, NPF XII issued Notes in the principal amount of $100,000,000, including $96,000,000 in Class A Notes and $4,000,000 in Class B Notes (the "2001-4 Series").

7

19. On or about May 17, 2002, NPF XII issued Notes in the principal amount of $250,000,000, including $240,000,000 in Class A Notes and $10,000,000 in Class B Notes (the "2002-1 Series").

C.  The Note Purchases

20. On or about June 21, 2001, MLIC purchased $18 million in Class A Notes and $5 million in Class B Notes in the 2001-2 Series.

21. On or about November 14, 2001, MLIC purchased $14 million in Class A Notes in the 2001-4 Series.

22. On or about May 29, 2002, MLIC purchased $25 million in Class A Notes in the 2002-1 Series.

23. On or about June 6, 2002, MLIC purchased $16.6 million in Class A Notes in the 2001-2 Series.

24. On or about July 8, 2002, MLIC purchased $24 million in Class A Notes in the 2001-4 Series.

25. On or about August 6, 2002, MIAC purchased $18.46 million in Class A Notes in the 2001-1 Series.

26. MIAC and MLIC purchased the Notes on the basis, among other things, of private placement memoranda and other sales

8

materials, delivered to them in MLIC's New Jersey office, where the decisions to purchase the Notes were made.

27.   MIAC and MLIC still own all or substantially all of the Notes they purchased in the foregoing transactions.

D.   Bank One Had Extensive Fiduciary And Contractual Duties to the Noteholders Under the Master Indenture

28.   Under the Master Indenture, Bank One explicitly agreed to assume fiduciary duties to the Noteholders.  Under Section 8.11,[1] Bank One accepted its appointment as a "fiduciary for the Holders of the Notes" and agreed to "execute the trusts [created by the Master Indenture] as a fiduciary for such Holders upon the terms and conditions set forth in this Master Indenture." Accordingly, under the Master Indenture, as set forth further below, Bank One had fiduciary obligations, among other things, to supervise the Noteholders' collateral, including cash reserve accounts, and to enforce the Noteholders' rights and remedies in the event of a default by NPF XII.

29.   Under the Master Indenture, the payment of principal and interest on all series of Notes was to be secured through NPF XII's pledge of the accounts receivable it acquired from the various health care providers and other collateral.  NPF XII's

---

[1]   References herein to "Section ___" are to the corresponding section or subsection in the Master Indenture.

acquisitions of the receivables were to be structured as actual purchases, and not as loans or debt financing. This structure was supposed to ensure that the Noteholders would have minimal, if any, direct credit exposure to the providers because the parties paying the receivables would be government agencies, such as Medicaid and Medicare, or large insurance companies.

30. Pursuant to Section 3.01, in consideration of the purchase of the Notes and to secure the payment of principal and interest on the Notes, NPF XII granted to Bank One, on behalf of the Noteholders, a perfected first lien on and security interest in certain collateral, including, among other things, the purchased receivables and related contracts, a cash account used to purchase receivables (the "Purchase Account"), a cash account holding proceeds derived from permitted investments in government securities (the "Equity Account"), and a cash account established in the event receivables were not generating cash sufficient to pay interest on the Notes (the "Interest Shortfall Reserve Account"). Section 3.02 prohibited NPF XII from transferring or releasing the collateral, or any part thereof, except in the specific circumstances identified in the Master Indenture.

31. Under Section 4.03, NPF XII represented and warranted to Bank One, on behalf of the Noteholders, that, among other

10

things, throughout the term of the Master Indenture: there was and would be no event which had, or was reasonably likely to have, a material adverse effect on NPF XII's operations or financial condition; it had an adequate amount of capital to conduct its business; the receivables met certain requirements; no representations, warranties or statements made or certificates, documents or financial statements provided by NPF XII were untrue or incomplete in any material respect or contained any misrepresentation of a material fact or omitted to state any material fact necessary to make any such statement not misleading; and NPF XII would maintain specified credit reserve balances with respect to each provider from which receivables were acquired.

32.   Under Section 7.01(g), a breach in any material respect of the representations and warranties set forth in Sections 3.02 or 4.03 constituted an Event of Default under the Master Indenture.

33.   Sections 6.01, 6.02, and 6.03 required that, in addition to the Interest Shortfall Reserve Account, Purchase Account and Equity Account, certain other reserve accounts be created and maintained with Bank One, including the Collection Account, Seller Credit Reserve Account, and Offset Reserve Account, as defined in the Master Indenture.   At all relevant

11

times, Bank One had custody and control over the foregoing accounts and was obligated to administer such accounts strictly in accordance with the Master Indenture. Because Bank One had custody and control over all of these accounts at all relevant times, no transfer of funds could or did take place without Bank One's knowledge, consent and action.

34. Under Section 6.06(a), Bank One was permitted to disburse funds from the Equity Account only to the Noteholders, to Bank One for fees and expenses, to NPFS for its fees, and, after all other payments were made, to NPF XII, with respect to any remaining amounts in excess of a specified account balance for each series of Notes. No other disbursements were permitted under the Master Indenture. The Master Indenture did not provide for any disbursements from the Equity Account to the Purchase Account.

35. Sections 4.04(d) and 4.11(e) required NPF XII to keep its assets separate from those of NCFE and any NCFE affiliate, and Section 4.09, with certain limited exceptions, prohibited it from transferring or releasing its assets. NPF XII was also prohibited under Section 4.11(c), with certain limited exceptions, from engaging in any intercorporate transactions with NCFE or any other affiliate.

12

36.   Sections 4.12 and 5.04 required that NPF XII and NPFS provide Bank One with extensive reports, including reports regarding the conduct of NPF XII's business, including quarterly balance sheets and statements of income and retained earnings, annual financial statements, monthly investor reports periodically audited by independent auditors, and monthly reports concerning each purchased receivable, with a bi-quarterly verification by independent auditors of the procedures of NPFS with respect to such receivables.

37.   Pursuant to the terms of Exhibit 7 to the Master Indenture, Bank One was required, among other things, to determine if Events of Default had occurred, to confirm that payments to the Noteholders of principal and interest had been made, to recalculate the concentration amounts of receivable payors to ensure NPF XII compliance with Section 4.13 limits on such concentration, recalculate the receivables reports and the collateral coverage reports received from NPFS.

38.   Sections 7.01 and 7.02 obligated Bank One to provide, where applicable, NPF XII, NPFS, the Noteholders and ratings agencies with notice of Events of Default and of facts and circumstances that could lead to the declaration of an Event of Default with the passage of time.  The definition of "Event of Default" includes, in addition to certain payment defaults and

13

insolvency, among other things: (i) any material default in performance, or material breach of any covenant or agreement of NPF XII in the Master Indenture (subject to certain limitations) or (ii) any material breach of the representations and warranties of NPF XII in the Master Indenture.

E.   Bank One Knowingly Breached Its
     Obligations under the Master Indenture

39.   Bank One repeatedly violated the terms of the Master Indenture and ignored its fiduciary and other obligations thereunder to protect the Noteholders. NPF XII likewise operated in violation of the terms of the Master Indenture without regard for the rights of the Noteholders.

40.   Bank One not only wrongfully failed to prevent, it implemented, the misuse of NPF XII funds in violation of the Master Indenture.  Bank One repeatedly transferred funds from the NPF XII Equity Account and Reserve Accounts to the Purchase Account, in direct violation of the terms of the Master Indenture.  Bank One repeatedly transferred funds from NPF XII accounts to NPF VI accounts, also in direct violation of the terms of the Master Indenture.

41.   Moreover, Bank One failed to take appropriate action to protect the rights of the Noteholders.  Rather than protect the Noteholders, Bank One ignored the fact that the reserve

14

accounts were depleted to below the minimum reserve requirements set forth in the Master Indenture, and ignored the fact that the Notes were improperly collateralized.  Bank One repeatedly ignored Events of Default under the terms of the Master Indenture, despite having actual knowledge of those Events of Default.  Bank One failed to declare Events of Default, despite having actual knowledge of the breaches of the Master Indenture which constituted Events of Default thereunder. Instead, Bank One benefited from the diversions of monies between the accounts and the Events of Default under the Master Indenture by continuing to reap substantial trustee fees.

42.    The entire business of NPF XII was thus premised upon fraudulent practices and required and depended upon, Bank One's participation.

43.    The receivables purchased by NPF XII were intentionally overvalued by enormous amounts, and NPF XII advanced funds to providers for phantom receivables.   Both practices violated the terms of the Master Indenture, which only permitted amounts actually billed or accrued by the providers to be used as collateral.  In some cases, the health care providers executed promissory notes, or gave NPF XII security interests in their real property, equipment, personal property or equity in their business as collateral.  This type of collateral was not

15

permitted under the terms of the Master Indenture -- at least
not without the consent of the Noteholders, which consent was
never obtained.

44.   NPF XII listed receivables in its financial statements
without disclosing that the receivables were greatly overvalued
and often non-existent.  By the end of 1999, approximately 50%
of the receivables were worthless.  NCFE also incorrectly
reported that the NPF XII pool of receivables average term was
60 days, when the average term was actually closer to 180 days.

45.   NPF XII's improper conduct with respect to the
overfinancing of providers, the acceptance of improper
collateral and the issuance of unsecured loans led to major cash
shortages at NPF XII.  These cash shortages led NPF XII to
misuse the Reserve and Equity Accounts, which could only be
accomplished with the knowledge and participation of Bank One.

46.   Thus, Bank One repeatedly re-routed funds in the
Offset Reserve Account and the Seller Credit Reserve Account to
fund purchases of receivables, in violation of the terms of the
Master Indenture.  The Offset Reserve Account was designed to
secure the obligations of health care providers to repurchase
receivables that were rejected because the health care provider
breached a representation or warranty, and to insure against the
risk that federal and state agencies would offset overpayments

16

made in prior years against payments for current unrelated claims. The Seller Credit Reserve Account was intended to protect against credit defaults associated with the commercial or governmental payor's failure to pay. Bank One similarly routed funds from the Equity Account to fund the purchase of receivables. These repeated, improper account transfers by Bank One were in direct violation of the terms of the Master Indenture, and resulted in deficiencies in the reserve requirements and equity account balances.

47. As the deficiencies mounted, NPF XII took steps to cover up the cash shortages, and the fraud was compounded. Thus, in order to cover up the reserve and equity account deficiencies, NPF XII and Bank One engaged in a shell game, transferring money back and forth between NPF VI and NPF XII accounts, to meet reserve requirements on any given day. Bank One received wire transfer requests on a daily basis from Poulsen and other NCFE officers, directing Bank One to wire funds from NPF XII accounts to NPF VI accounts at J.P. Morgan Chase & Co. After the reserve requirements for NPF VI were tested, the funds were transferred back to NPF XII so that the reserve requirements for NPF XII could be "met". Bank One performed these wire transfers, thereby releasing NPF XII collateral in knowing violation of the Master Indenture.

17

48. As indenture trustee and fiduciary for the
Noteholders, Bank One was required, but utterly failed, to
monitor NPF XII. This function was crucial to ensure that the
Noteholders' rights were being protected, particularly because
NPF XII's business was supposed to entail a constant cycle of
advances and collections on receivables. Bank One had the
obligation to ensure that the Notes were properly
collateralized, and to protect that collateral.

49. Nevertheless, Bank One failed to properly perform any
investigation or due diligence, despite the fact that it had
actual knowledge of numerous NPF XII violations of the Master
Indenture. Among other things, Bank One never properly
performed any reconciliation of providers receivables; never
properly performed any examination of credit or creditworthiness
of the providers; never properly performed any investigation
regarding the unsecured indebtedness of the providers, or the
use of unacceptable collateral to secure advances from NPF XII;
and never properly investigated the lack of acceptable audits
when loans were being made.

50. Moreover, as Bank One knew or should have known, NCFE
and its business were ridden with undisclosed conflicts of
interest since before plaintiffs purchased their Notes. Among
other things, NCFE and its principals owned significant

18

interests in many, if not most, of the primary health care
provider companies from which NPF XII purchased receivables.

51.    These conflicts of interest created inappropriate
incentives for NCFE, NPF XII and their principals to advance
funds to, and indeed to overfund, providers in violation of the
Master Indenture.  Most, if not all, of the providers in which
NCFE, NPF XII and their principals had equity interests were
companies suffering substantial losses for which NCFE was the
only available source of working capital.  Indeed, some of these
providers disclosed in their public securities filings that they
could not continue as going concerns in the absence of NCFE
funding.

52.    Thus, as Bank One knew or should have known, the NCFE
and NPF XII principals were left, particularly as the providers
continued to deteriorate, with the choice of supporting such
providers through unsecured and other improper advances from NPF
XII accounts or losing their equity investment by letting the
providers go bankrupt.  The principals chose to advance their
own interests over those of the Noteholders by funding the
providers with hundreds of millions of dollars in unsecured
advances from NPF XII in violation of the Master Indenture.

19

F.    The Fraudulent Scheme Unravels

53.  As a result of, among other things, the improper conduct of Bank One and the NCFE entities in failing properly to collateralize the Notes and in overfunding providers, NPF XII faced significant cash shortages.  Ultimately, NPF XII did not have the necessary cash to make interest payments on the Notes when payments became due, or to pay the principal on matured Notes.  Instead, with Bank One serving as trustee under the Master Indenture, NPF XII, again in breach of its obligations to Noteholders, issued new Notes, the proceeds of which it used to pay certain existing Noteholders the interest and principal due on their Notes.

54.  Approximately $800 million of the over $2 billion generated from the sale of NPF XII Notes were not used to buy receivables as required under the Master Indenture, but were instead used for other impermissible purposes, including advances of unsecured loans for future receivables.

55.  NPF XII's auditors, Deloitte & Touche LLP ("Deloitte"), delayed the completion of its 2001 audit as a result of concerns about the ability of NPF XII to collect on receivables and other collateral, thereby hindering NPF XII's ability to raise money from new Note issuances.  Ultimately, Deloitte refused to express an opinion regarding financial

20

statements for NPF XII for 2001, purportedly based upon NPF
XII's failure to provide certain information concerning the
value of NPF XII's receivables and collateral by October 2002.

56.   Despite the refusal of Deloitte to certify the NPF XII
audit reports, Bank One took no appropriate steps to protect the
interests of the Noteholders and did not declare an Event of
Default as warranted under the Master Indenture, until late
October 2002.

57.   When the reserves became depleted to below the minimum
amounts required under the Master Indenture and/or when
promissory notes and other security interests that NCFE obtained
from health care providers were used for bond collateral, Bank
One should have declared defaults under the Master Indenture.
Despite the fact that Bank One knew about the overfunding and
improper account practices, knew about the improper account
balance transfers, and knew about the "round-tripping" of funds
between NPF VI and NPF XII and the testing of reserve
requirements on different days, Bank One failed to declare an
Event of Default and, indeed, stated, in early October 2002,
that no Event of Default under the NPF XII Master Indenture
existed when Bank One had actual knowledge of such defaults.

58.   Thus, Bank One, intentionally, recklessly and/or with
gross negligence breached the terms of the Master Indenture and

21

authorized, aided or completely ignored NPF XII's breaches of the Master Indenture, in violation of its duties as trustee and fiduciary.

59. Bank One ignored all Events of Default until October 24, 2002, when it finally declared an Event of Default under the Master Indenture because of shortages in the reserve accounts.

60. By November 2002, the level of required cash reserves in NPF XII had decreased from $300 million to almost nothing. On November 16, 2002, the Federal Bureau of Investigation raided the NCFE offices and seized the company's books and records. On November 18, 2002, NCFE and its subsidiaries filed petitions for relief under chapter 11 of the Bankruptcy Code.

## COUNT 1

(Breach of Contract -- Pre-Default)

61. Plaintiffs reallege the allegations of paragraphs 1 through 60 hereof.

62. Pursuant to Section 10.10 of the Master Indenture, and by operation of law, the Noteholders are entitled to all benefits and all legal and equitable rights, remedies and claims under the Master Indenture, and are entitled to enforce the obligations of Bank One thereunder.

63. Bank One breached its obligations to plaintiffs under the Master Indenture by, among other things, improperly releasing collateral, improperly making transfers from the reserve and equity accounts for the purchase of receivables, and improperly making transfers from NPF XII accounts to non-NPF XII accounts.

64. By reason of the foregoing, plaintiffs have been damaged in amounts to be determined at trial.

## COUNT 2

(Breach of Contract -- Post-Default)

65. Plaintiffs reallege the allegations of paragraphs 1 through 60, 62, and 63 hereof.

66. Pursuant to the terms of the Master Indenture, in the case of an Event of Default under the Master Indenture, Bank One was obligated to exercise the rights and powers vested in it by the terms of the Master Indenture, and to use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

67. Despite numerous Events of Default under the terms of the Master Indenture, Bank One breached its obligations to plaintiffs under the Master Indenture by, among other things,

23

failing to exercise the rights and powers vested in it by the terms of the Master Indenture, and failing to use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

68.   By reason of the foregoing, plaintiffs have been damaged in amounts to be determined at trial.

## COUNT 3

(Breach of Fiduciary Duty)

69.   Plaintiffs reallege the allegations of paragraphs 1 through 60, 62, 63, 66, and 67 hereof.

70.   As a fiduciary under the Master Indenture, Bank One owed to the Noteholders the fiduciary duties of fidelity, loyalty, trust, honesty and due care, and was required to carry out its duties and responsibilities in a fair, just and equitable manner and to act in the best interests of the Noteholders, and not in furtherance of its own interests.

71.   Bank One, by engaging in the conduct set forth above, breached its fiduciary duties to the Noteholders.

72.   By reason of the foregoing, plaintiffs have been damaged in amounts to be determined at trial.

24

## COUNT 4

(Negligence and Gross Negligence)

73.   Plaintiffs reallege the allegations of paragraphs 1 through 60, 62, 63, 66, 67, 70, and 71 hereof.

74.   Defendant owed a duty to plaintiffs to use ordinary care in carrying out its obligations.  Defendant breached this duty through the conduct set forth above.

75.   Plaintiffs were directly and forseeably injured as a result of defendant's negligence and gross negligence.

76.   By reason of the foregoing, plaintiffs have been damaged in an amount to be determined at trial.

WHEREFORE, plaintiffs demand judgment:

(a)   on Counts 1 through 4, awarding plaintiffs compensatory damages in amounts to be determined at trial, but not less than a total of $121 million, together with interest, attorneys' fees, costs and disbursements; and

(b)   on Counts 3 and 4, awarding plaintiffs punitive and exemplary damages in amounts to be determined at trial; and

25

(c)   such other and further relief as is just and

proper.

Dated:      Newark, New Jersey
            April 25, 2003

                            KASOWITZ, BENSON, TORRES
                            & FRIEDMAN LLP

                            By: _____

                                Marc E. Kasowitz
                                Daniel R. Benson
                                Harold G. Levison
                                Cindy Caranella Kelly

                            One Gateway Center
                            Suite 2600
                            Newark, New Jersey  10019
                            (973) 645-9462

                            Attorneys for Plaintiffs

26

## Local Civil Rule 11.2 Certification

Pursuant to Local Civil Rule 11.2, the undersigned hereby certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated:      Newark, New Jersey
             April 25, 2003

> KASOWITZ, BENSON, TORRES
> & FRIEDMAN LLP
>
> By: _____
>
> Marc E. Kasowitz
> Daniel R. Benson
> Harold G. Levison
> Cindy Caranella Kelly
>
> One Gateway Center
> Suite 2600
> Newark, New Jersey   10019
> (973) 645-9462
>
> Attorneys for Plaintiffs